# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| **ROBENA G. REID,** | ) |
| PO Box 775 | ) |
| Lorton, VA 22199 | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) Civil Action No. _____ |
| v. | ) |
|  | ) **JURY TRIAL DEMANDED** |
| **ELAINE CHAO,** | ) |
| **SECRETARY** | ) |
| **US DEPARTMENT OF TRANSPORTATION** | ) |
| 1200 New Jersey Avenue, SE | ) |
| Washington, DC 20590 | ) |
|  | ) |
| Defendant. | ) |

_____

## COMPLAINT

1.     Plaintiff Robena Reid brings this action for damages based on the denial of her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act of 1991 (hereinafter "Title VII").  Specifically, the United States Department of Transportation (hereinafter "the Agency" or "DOT") subjected her to discriminatory employment practices because of her sex (female); in retaliation for her prior EEO activity; and harassed her and created a hostile work environment in reprisal.

## JURISDICTION AND VENUE

2.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 1343(a)(4), and 42 U.S.C. § 2000e-5.

3.     Pursuant to 28 U.S.C. § 1391(e) and 42 U.S.C. § 2000e-5(f)(3), venue is proper in the District of Columbia which is the location of the Agency's principal office, where Plaintiff worked

while employed at the Agency and where, upon information and belief, the employment records relevant to the Complaint are located.

## THE PARTIES

4.      At all times relevant to this Complaint, Robena G. Reid worked for the US Department of Transportation, US Federal Transit Administration ("FTA"), Office of Policy Review and Development, Office of Policy and Budget, as a Financial Economist, GS-13, in Washington, DC. Ms. Reid has engaged in prior protected EEO activities. Ms. Reid also served as an elected Union Official and advocated for employees on both labor and EEO matters.

5.      Defendant Elaine Chao is the Secretary of the United States Department of Transportation. Ms. Reid brings suit against Secretary Chao in her official capacity as provided by law based on her executive responsibility for administering the Agency's personnel policies and her responsibility to enforce and promote equal employment opportunity throughout the Agency. During the relevant time period, the Agency employed over 500 employees.

6.      Kimberly A. Gayle, Director, Office of Review Policy and Development, is not a named defendant in this lawsuit, but Ms. Reid identified Ms. Gayle as a responsible management official in her EEO complaints against the Agency.  Ms. Gayle was one of the deciding officials who treated Ms. Reid differently because of her protected EEO activities. During Ms. Reid's EEO processing, Ms. Gayle acknowledged that she became of aware of Ms. Reid's EEO activities when Ms. Reid requested official time in November 2012 for an ongoing EEO complaint. Thereafter, Ms. Gayle continued to be informed of Ms. Reid's protected activity whenever Ms. Reid requested official time and/or when Ms. Reid filed new EEO complaints.

7.      Katherine Mattice, Associate Administrator for Budget and Policy/Deputy Chief Financial Officer, is not a named defendant in this lawsuit, but Ms. Reid identified Ms. Mattice as a

responsible management official in her EEO complaints against the Agency.  Ms. Mattice was one of the deciding officials who treated Ms. Reid differently because of her protected EEO activities. During Ms. Reid's EEO processing, Ms. Mattice stated that she was aware that Ms. Reid was involved in an EEO and Whistleblower complaint in 2006 that was resolved in March 2008. Ms. Mattice was also received documentation in 2013 about the resolution of another EEO complaint filed by Ms. Reid. Ms. Mattice continued to be informed of Ms. Reid's protected activity whenever Ms. Reid filed new EEO complaints.

8.      Robert Tuccillo, Associate Administrator for Budget and Policy and the Chief Financial Officer, is not a named defendant in this lawsuit, but Ms. Reid identified Mr. Tuccillo as a responsible management official in her EEO complaints against the Agency.  Mr. Tuccillo was one of the deciding officials who treated Ms. Reid differently because of her protected EEO activities. During Ms. Reid's EEO processing, Mr. Tuccillo acknowledged that he was aware of Ms. Reid's EEO complaint in 2006 that was resolved in March 2008. Thereafter, Mr. Tuccillo continued to be informed of Ms. Reid's protected activity whenever Ms. Reid filed new EEO complaints.

9.      David Lee, Human Resources Specialist, is not a named defendant in this lawsuit, but Ms. Reid identified Mr. Lee in her EEO complaints against the Agency.  Mr. Lee, an agent of DOT, was involved in advising the deciding officials who treated Ms. Reid differently because of her protected EEO activities. During Ms. Reid's EEO processing, Mr. Lee acknowledged that he was aware of Ms. Reid's EEO activity. Mr. Lee continued to be informed of Ms. Reid's protected activity whenever Ms. Reid filed new EEO complaints.

**FACTS**

10.     Ms. Reid has worked for DOT on lending initiatives as well as a variety of economic and financial topics since 1997. She joined the FTA as an economist in September 1999. Ms. Reid's undergraduate degree included business and economics; she also has a Master of Science in Finance and a Master of Business Administration with a concentration in economics.

11.     Ms. Reid has also served as an elected Union Official for the American Federation of Government Employees ("AFGE") Local 3313. Ms. Reid filed and successfully resolved numerous EEOC cases on behalf of her constituent members. In particular, by 2013, Ms. Reid had acted as a witness and advocate in approximately 18 EEO complaints at the FTA. Ms. Reid also successfully resolved a series of Unfair Labor Practice ("ULP") complaints against her supervisor Ms. Kimberly Gayle and other Agency management officials. Ms. Reid, in her role as the elected Executive Vice President of Local 3313, assisted with filing a grievance in July 2014. This class action case alleged overtime violations against the Agency and ultimately recovered millions of dollars in damages for DOT employees.

12.     After the events occurred that are relevant to this Complaint, Ms. Reid was removed from federal service. Ms. Reid filed with the Merit System Protection Board ("MSPB") to oppose her removal (the "MSPB Cases").  Ms. Reid also filed a Union grievance, an Arbitration was held, and a decision issued on March 20, 2019, Federal Mediation and Conciliation Service, Case # 170916-54874 (hereinafter the "Arbitration Case"). The Arbitration Case ordered the reinstatement of Ms. Reid to federal service and awarded damages.

13.     *The Arbitration Case and MSPB Cases are completely separate proceedings from this Complaint. This Complaint explicitly does not raise any issues, claims or demand for damages which were raised in the Arbitration Case and/or MSPB Cases.*

14.     *Ms. Reid does not make any claim or cause of action in this Complaint related to her removal from federal service.*

15.     *Ms. Reid does not seek any damages or loss arising from, or related to, her termination in this Complaint.*

16.     *On February 14, 2020, the U.S. Equal Employment Opportunity Commission, Office of Federal Operations ("OFO") issued a Right to File a civil action, Request No. 2020000200, Appeal No. 0120181392, Hearing No. 570-2014-01070X, 2013-25015-FTA-02, 2014-25615-FTA-02, 2014-25616-FTA-02, 2014-25892-FTA-02, 2015-26164-FTA-02 (hereinafter the "OFO Case"). This Complaint is exclusively and solely filed to pursue only those claims, issues and damages raised, and related to, the OFO Case and the related EEO/EEOC proceedings.*

       i.  **In January 2013, the Agency Prohibited Ms. Reid from Using Official Time to Make a Presentation for the Transportation Research Board and Ms. Reid Used Four (4) Hours of Annual Leave Instead.**

17.     Ms. Reid was a member of the Transportation Research Board ("TRB") from 2013-2015 and a "friend" of the committee from 2002-2015. The TRB is affiliated with the various modal agencies of DOT including the FTA, and the DOT provides millions in annual funding for the TRB.

18.     Ms. Reid was nominated to be on the Revenue and Finance Committee by a member of the TRB. Ms. Reid has delivered economic and financial presentations for the TRB, including a presentation at the 2006 TRB Annual Conference; a TRB Finance Conference in 2010; and a TRB sponsored finance conference in 2011. Ms. Reid has also reviewed TRB research papers as part of her job duties from 2004-2015. Ms. Reid's supervisors at FTA regularly gave her official duty time to participate on the Revenue and Finance Committee and other FTA employees also routinely receive official duty time for FTA-related activities.

19.     Ms. Gayle became Ms. Reid's supervisor in approximately October 2011.

20.     On approximately September 10, 2012, Ms. Reid and Ms. Gayle began exchanging a series of emails regarding Ms. Reid's plans to work on a poster presentation for the Annual TRB Conference. The presentation involved a financial topic (surety) and was based on FTA funded research published in July 2012. It also dealt with public/private partnerships and the Transit Cooperative Research Project ("TCRP").

21.     On approximately October 16, 2012, Ms. Reid informed Ms. Gayle that she was continuing her work on the TRB poster presentation for the Annual Conference and Ms. Gayle requested a copy. Ms. Reid provided Ms. Gaye with a preliminary proposal and Ms. Gayle indicated that she would discuss it with the appropriate officials for approval.

22.     On approximately November 28, 2012, Ms. Gayle sent Ms. Reid an email stating that she believed Ms. Reid had submitted the poster presentation to TRB and it should be withdrawn pending approval. Ms. Gayle later admitted that she had not reviewed or submitted the proposal for approval in October 2012 as she had previously indicated.

23.     To assure Ms. Gayle and Agency management that her poster presentation to TRB was appropriate, Ms. Reid explained that the presentation was derived from a TRB report published in 2012. Ms. Reid also reached out to Rita Maristch, a surety legal researcher, by email on November 28, 2012 and January 3, 2013, to review the poster presentation to confirm that all of the information was in the public domain.

24.     On January 3, 2013, Ms. Gayle stopped Ms. Maristch from conducting the review, informing her that Ms. Reid had not been approved to participate in the TRB Annual Conference. Also, on that same day, Ms. Gayle asked Ms. Reid to resubmit her presentation so that it could be

reviewed for approval. This was a surprise to Ms. Reid because Ms. Gayle had not informed her that the poster presentation was still pending approval.

25.     On January 10, 2013, less than four days before Ms. Reid was scheduled to participate in the TRB Annual Conference, Ms. Gayle notified Ms. Reid that she was not authorized to give her poster presentation while on duty time.

26.     The Agency had already approved and authorized Ms. Reid to attend the TRB Annual Conference on official duty time. Accordingly, Ms. Reid did not receive official duty time for the time she spent during her poster presentation session and she was forced to use approximately four (4) hours of annual leave to deliver the presentation. Upon information and belief, Ms. Reid was the only Agency employee who was required to use annual leave in order to give a professional presentation at the 2013 TRB Annual Conference.

27.     Ms. Gayle stated that she discussed the TRB poster presentation with Ms. Mattice and Mr. Tuccillo. Ms. Gayle claimed that the reason Ms. Reid was not allowed official duty time for the presentation was that the topic was not related to Ms. Reid's official position and wasn't a priority topic for the Agency.

28.     However, the presentation was related to Ms. Reid's work duties. Ms. Reid's Position Description specifically references these duties which states, "Represents the office in both internal and external meetings." And, Ms. Reid's performance plan for the applicable time period included these topics as part of her annual evaluation, stating, "Proposes and develops workshops, presentations and poster session for the TRB Finance Committee and identifies speakers for proposed topics."

29.     Additionally, certain large FTA projects are required by law to purchase a surety bond. As part of Ms. Reid's work on FTA's lending program, applicants occasionally provided information

on how much they have spent on surety as one element of their loan application. In January 2013, at least 30 percent of Ms. Reid's work was conducting oversight of FTA loan applications and she had been doing this type of program support for over a decade.

30.      Ms. Reid's poster presentation research on TCRP surety was also extremely pertinent to government contracting, as it adds to the costs of project delivery, and Ms. Reid's duties have included a review of public/private partnerships. As such, Ms. Reid proposed the TCRP surety research topic in 2008, 2010, 2011 and 2012 as a way of furthering her professional expertise. She also served on a Government Finance Officers Association team that developed guidelines for public/private partnerships.

31.      Furthermore, Ms. Reid was a Contracting Officer Technical Representative (COTR) in January 2013. Her poster presentation would have counted toward Ms. Reid's COTR recertification which includes performing eight (8) hours of pertinent professional activities. As such, the TRB poster presentation would have been relevant to Ms. Reid fulfilling her ongoing COTR certification requirements.

32.      The topic of the presentation was also a priority for the Agency because it was based upon research completed under the auspices of a TRB program that was financed by the Agency. In particular, the Agency had paid an independent contractor in 2012 to conduct research on this topic and deliver a report to the Agency that was ultimately published in the public domain (*National Academies of Sciences, Engineering, and Medicine. July 2012. TRB's Transit Cooperative Research Program (TCRP) Legal Research Digest 40: Issues Involving Surety for Public Transportation Projects. Washington, DC: The National Academies Press*).  The Agency would not have used taxpayer dollars for such a project if it was not a priority for the Agency.

33.     At the time, poster presentations were the most popular presentations at the TRB Annual Conference and the TRB had ramped up its presentation options in the poster presentation category. There were many colleagues from DOT delivering poster presentations at the 2013 TRB Annual Conference that addressed the public/private partnership topic that Ms. Reid included in her poster presentation. In fact, the topic occupied an entire session at the TRB Annual Conference, which was jointly sponsored by the Revenue and Finance Committee, the Economics Committee and the Economic Development Committee.

34.     Ms. Reid believes the Agency denied her official duty time to give the poster presentation to interfere with her professional activities with the TRB; to impugn her professional reputation; and to create a chilling effect from engaging in further protected EEO activities.

### ii. Since August 2013 and Continuing, the Agency Removed Ms. Reid's Specific Job Duties Related to the Agency's Financial Programs.

35.     Starting in approximately August 2013 and ongoing, the Agency removed Ms. Reid's job duties and responsibilities that related to DOT financial programs, such as the Transportation Infrastructure Finance and Innovation Act ("TIFIA"), a DOT program that provides credit assistance for surface transportation projects.

36.     Ms. Reid had been working on such financial and lending programs since 1998, before TIFIA became law, and when she worked for the Federal Highway Administration. At one time, she worked on DOT financial and lending programs approximately 50% or 60% of the time. Ms. Reid was formerly the staff lead on FTA-related DOT lending programs.

37.     In an email dated August 13, 2013, Ms. Gayle claimed that she removed the specific duties from Ms. Reid's performance plan to better reflect her actual duties and to make Ms. Reid's performance plan more accurate.

38.     However, Ms. Reid still had a role in the innovative finance review when Ms. Gayle sought to change Ms. Reid's duties in August 2013.

39.     Further, Ms. Gayle and Agency Human Resources failed to make any changes to Ms. Reid's official Position Description, demonstrating that the rationale for removing the duties was pretextual. DOT financial programs are included in Ms. Reid's Position Description; it constitutes a performance standard that has a weight of 25%; and the Position Description was not re-written to reflect the change supposedly made by Ms. Gayle. In fact, Ms. Reid's Position Description has remained unchanged since June 12, 2003.

40.     Additionally, in October 2008, Ms. Reid was detailed to the United States Treasury for six months as part of a settlement agreement with the Agency. During Ms. Reid's time away on detail, the Agency assigned Jorianne Jernberg the TIFIA work in Ms. Reid's absence. Subsequently, when Ms. Jernberg left FTA in September 2009, the duties were partially assigned to Thomas Yedinak. Ms. Reid believes the financial program duties were not fully restored to her performance standards as an act of retaliation.

41.     Ms. Reid is not aware of the Agency removing job duties from any of her coworkers during that same time period.

42.     Ms. Reid believes that a male employee in the policy office with less education and experience was partially assigned her TIFIA duties.

          **iii. In January 2014, the Agency Retaliated Against Ms. Reid by Harassing Her Concerning Attendance at the Transportation Research Board Annual Conference and Interfering with Her Professional Network Opportunities.**

43.     On or about January 2, 2014, Ms. Gayle sent an email to her staff, including Ms. Reid, inquiring whether they planned to attend the TRB Annual Conference, and if so, to provide the dates, times and sessions they would attend. Ms. Gayle also stated that she would review the

requests to ensure sufficient office coverage and would get back to them to confirm their attendance. Ms. Reid immediately responded that same afternoon to provide the requested information, including her intent to attend a TRB committee meeting on Sunday, January 12, 2014.

44.    Upon information and belief, it is clear that Ms. Gayle was aware that Ms. Reid planned to attend the 2014 Annual Conference, particularly given Ms. Reid's active participation and membership in TRB, as well as the previous year's retaliatory incident wherein Ms. Gayle and Agency management hindered Ms. Reid from providing a poster presentation to the 2013 TRB Annual Conference.

45.    Upon information and belief, the January 2, 2014 email to all staff regarding attendance at the TRB Conference was sent by Ms. Gayle to build a pretext to harass Ms. Reid about her participation and to retaliate against her.

46.    On Friday, January 10, 2014, which was the weekend when the TRB Annual Conference started, Ms. Gayle sent Ms. Reid another emailing requesting a review of one of Ms. Reid's assignments, the Grant Anticipation Notes ("GAN") Fact Sheet.  Ms. Gayle demanded that the information be provided to her before Ms. Reid would be allowed to attend the TRB Annual Conference.

47.    Ms. Reid did not receive this email until late afternoon; nonetheless Ms. Reid completed the update and emailed the information to Ms. Gayle the same day at approximately 6:17 p.m.  Ms. Reid also informed Ms. Gayle that she had not received several documents related to the GAN Fact Sheet and asked that it be provided. Having completed the request, Ms. Reid asked Ms. Gayle to confirm approval regarding her attendance at the TRB Annual Conference.

48.    It was not customary to make attendance at a conference contingent on completing assignments. There were approximately five (5) other employees in the department and, upon

information and belief, no one else was required to submit updates to their assignments to attend the TRB Annual Conference.

49.     Ms. Gayle had advance notice of Ms. Reid's planned participation in the 2014 TRB Annual Conference; however, on Friday, January 10, 2014, Ms. Gayle imposed an unrealistic and unnecessary condition on Ms. Reid's attendance just prior to a TRB committee meeting scheduled on Sunday, less than 42 hours away, as well as the main conference on Monday, January 13, 2014.

50.     Because the TRB committee meeting began on Sunday, January 12, 2014, Ms. Gayle's request on Friday left Ms. Reid in "limbo" regarding her attendance at the TRB Conference and whether she should be available on Monday to review the Grant Anticipation Notes ("GAN") Fact Sheet assignment.

51.     Ms. Reid believes Ms. Gayle's request was made to harass her for engaging in protected EEO activities and to chill her participation.

52.     Ms. Gayle claimed that she needed a status update because the GAN Fact Sheet was supposedly overdue.

53.     The GAN Fact Sheet was not an urgent assignment. There were several levels of review that would be required, as well as policy decisions by the FTA legal department, that still needed to be determined before completion. Ms. Gayle was aware that the GAN Fact Sheet would be subject to several additional document iterations. In fact, the GAN Fact Sheet subsequently underwent several internal reviews, and it was far from ready for publication on the FTA public web site.

54.     Ms. Gayle's last-minute request regarding the GAN Fact Sheet left Ms. Reid uncertain about her ability to use her official duty time to attend the Sunday meeting; she therefore entered a request to use accrued compensation time to attend the TRB committee meeting.

55.     Ms. Reid had previously attended TRB committee meetings on a Sunday and past practice was to grant compensation time for weekend attendance. Ms. Reid was a member of the TRB Revenue and Finance Committee which sponsored sessions on Sundays for many years. Ms. Reid's activities were work-related, she and other DOT employees attended the weekend sessions and received compensation time for attendance. However, Ms. Gayle changed this practice and denied Ms. Reid compensatory time for her Sunday attendance.

56.     Ms. Reid was required to use accrued leave or earned compensation time to attend the TRB committee meeting on Sunday, January 12, 2014. Upon information and belief, coworkers that attended the TRB Annual Conference over the weekend were not required to use accrued leave or earned compensatory time to attend the meetings.

57.     Ms. Gayle also asked Ms. Reid and the attendees of the Conference to submit a report about the sessions they attended. When Ms. Reid attended the TRB Annual Conference previously, she was not required to submit a report. Furthermore, Ms. Reid is normally not responsible for submitting reports for work that is not part of her official (paid) time. Since Ms. Gayle denied official time for the Sunday sessions, Ms. Reid did not report on the events of that day because she used her own time. Ms. Reid provided Ms. Gayle with a report for her Monday attendance which was during regular duty hours.

### iv. In March 2014, the Agency Obstructed Ms. Reid's Request for Official Time to Assist an Employee with an EEO Complaint.

58.     On March 27, 2014, Ms. Reid sent an email to Ms. Gayle requesting Official Time in April 2014 to assist an individual with an EEO complaint. Ms. Reid requested approximately seven (7) hours of time to meet with the employee and another representative. On March 28, 2014, Ms. Reid send a follow-up email to Ms. Gayle, asking, "What is the status of this CASTLE [the Agency electronic time-keeping system] request for Official Time?"

59.     Ms. Gayle responded by denying the official time request and instructed Ms. Reid to cancel the meeting with the employee because she wanted to meet with Ms. Reid on March 28, 2014. Ms. Reid had no choice but to cancel her scheduled meeting with the employee.

60.     Ms. Gayle informed Ms. Reid via email that the purpose of the March 28, 2014, meeting was for Ms. Reid to provide an update on the GAN Fact Sheet assignment. At that time, the assignment was still in the review stage.

61.     As stated previously, the GAN Fact Sheet assignment was not urgent and still required many levels of Agency approval. In fact, Ms. Reid had previously informed Ms. Gayle that the assignment contained specific legal impediments. Indeed, when Ms. Reid ultimately sent the GAN Fact Sheet to Dana Nifosi, Agency Senior Attorney, for review, it was not released from the Agency Legal Department. Upon information and belief, as of January 2015, review of the GAN Fact Sheet was never completed, and it was not published.

62.     This was not the first time Ms. Reid requested official time to assist employees with EEO Complaints. On previous occasions, Ms. Gayle would send each request for official time to Human Resources and Mr. Lee would regularly be assigned to review. Often, Mr. Lee would request that Ms. Reid obtain additional information about the purpose of the activities and the official time requested. At times, Mr. Lee advised Ms. Gayle to reduce the number of hours requested by Ms. Reid.

63.     Ms. Reid's request for official time to participate in EEO activities was obstructed by Agency management for the purpose of discouraging Ms. Reid's involvement in the EEO process.

**v. On April 16, 2014, the Agency Issued a Letter of Caution to Ms. Reid.**

64.     The Agency continued to escalate the retaliatory harassment against Ms. Reid when it issued a Letter of Caution on April 16, 2014, based upon false conduct allegations that allegedly

occurred during the March 28, 2014 meeting. As stated previously, Ms. Reid was required to cancel her request for official time to assist an individual with an EEO complaint in order to meet with Ms. Gayle on March 28, 2014 to discuss the GAN Fact Sheet assignment.

65.     According to Ms. Gayle, she issued the Letter of Caution because Ms. Reid was supposedly acting in a loud, defiant manner, and moving around aggressively in her chair during the March 28, 2014 meeting.

66.     Ms. Reid denies that she acted inappropriately during the meeting on March 28, 2014 and her relationship with Ms. Gayle has been professional.

67.     Ms. Reid's work area at the time was an open group of cubicles which made conversations clearly audible to everyone working in the area. Ms. Reid did not raise her voice during the conversation with Ms. Gayle, nor did she look at Ms. Gayle "angrily" or speak to Ms. Gayle in "an unkind way."

68.     Ms. Reid further does not recall "moving around" in her chair. At the time, Ms. Reid had been in physical therapy for a leg and hip injury for more than six months. As a result, Ms. Reid often changed her leg position while she was sitting. No one had ever told her or indicted that this motion appeared threatening. Ms. Reid also disputes that she was "walking sternly and assertively" since her leg injury inhibited her walking and limited her range of motion.

69.     Ms. Reid did not notice Ms. Gayle being upset before, during or after this meeting. Further, Ms. Reid disputes Ms. Gayle's claim that she was concerned about her safety. Ms. Reid believes that if Ms. Gayle felt threatened during the meeting, then she should have canceled the meeting and/or requested to meet with the DOT Security office. To the best of Ms. Reid's knowledge, Ms. Gayle never contacted the DOT Security office.

70.     Furthermore, Ms. Gayle's assertions of being threatened are belied by the fact that it took Ms. Gayle approximately two (2) weeks after the March 28, 2014 meeting to issue the Letter of Caution. The timing of the Letter of Caution was also in close proximity to the date that Ms. Reid filed an affidavit concerning an outstanding EEO reprisal complaint against Ms. Gayle.

71.     In addition to threatening Ms. Reid with "corrective action" if further alleged incidents occurred, Ms. Gayle also criticized Ms. Reid for requesting official time on March 28, 2014. The Letter of Caution specifically stated that Ms. Reid's request had not been approved and that Ms. Reid had to reschedule her EEO meeting to work on the GAN Fact Sheet assignment, despite the fact that he document still needed several levels of Agency review to be completed.

72.     Ms. Gayle issued similar letters to Ms. Reid on two other occasions in order to threaten Ms. Reid and discourage her EEO activity.  Ms. Reid was forced to file two separate Unfair Labor Practice (ULP) complaints against Ms. Gayle for issuing unfounded letters and the Agency settled both complaints. Yet, despite this history, Ms. Gayle continued her pattern of retaliatory harassment with the April 16, 2014 Letter of Caution.

73.     In a subsequent proceeding with the Office of Inspector General, Mr. Lee, a Human Resource Specialist involved with assisting in the issuance of the April 16, 2014 Letter of Caution, revealed the true retaliatory nature of Ms. Gayle's action. In Mr. Lee's testimony he stated that, "what actually led to the Letter of Caution was that Robena had requested an exorbitant amount of official time to represent people in their EEO complaints … she evidently likes the work, she likes fighting the fight for the people … she files EEO complaints consistently for everything, and she does see herself as the champion for the people." This statement by a Human Resource Specialist contradicts the Agency's claimed legitimate nondiscriminatory reasons for issuing the Letter of Caution to Ms. Reid.

**v. During a Performance Evaluation Meeting on August 21, 2014, the Agency Issued an "Unacceptable" Rating to Ms. Reid.**

74.     On August 21, 2014, Ms. Reid met with Ms. Gayle. Also, Godwin Nwosu, Director of the Office of Financial Management, who is not in Ms. Reid's management chain, was also in attendance at this meeting. Ms. Reid was under the impression that the purpose of the meeting was to discuss her 2015 Performance Plan. Instead, Ms. Gayle issued an unacceptable performance rating to Ms. Reid.

75.     Ms. Reid, who was unrepresented, immediately asked for Union Representation. Ms. Gayle responded to Ms. Reid's request for representation by asserting that Ms. Reid was not entitled to Union representation because they were only discussing past performance.

76.     Ms. Gayle selected Mr. Nwosu to be her witness and to speak favorably regarding Ms. Gayle's version of the events that transpired at the meeting. Mr. Nwosu was not a neutral witness. As such, Ms. Reid felt threatened and intimidated by Ms. Gayle who had a long history of harassing her in retaliation. Ms. Reid was afraid that Ms. Gayle was once again violating her rights by harassing her.

77.     In fact, Ms. Gayle failed to provide Ms. Reid with a copy of the unacceptable performance rating during the meeting. This was highly disconcerting to Ms. Reid who wanted to protect herself by having documentation of the false accusations against her. Accordingly, Ms. Reid asked Ms. Gayle if she could take the original Performance Appraisal with her to make a copy. Ms. Reid also had concerns that some of the entries were fraudulent and the document was evidence of the continuing illegal actions that were being taken against her.

78.     Although Ms. Gayle declined to allow Ms. Reid to take the original Performance Appraisal from the room, Ms. Reid did so anyway to protect herself and to assert her rights. However, because Ms. Reid viewed the document as evidence, she immediately sought assistance on how to

best handle the situation. Ms. Reid only wanted to protect herself from what she viewed as an unreasonable demand by Ms. Gayle that she not be allowed to copy the original document. Ms. Reid requested access to the original Performance Appraisal so that she could properly document the situation.

79.     Accordingly, immediately after leaving the meeting, Ms. Reid called the DOT Security Office because she felt threatened and harassed by Ms. Gayle's actions. Ms. Reid also contacted several union colleagues to serve as witnesses and to confirm that she took reasonable measures to return the document to Ms. Gayle. Ms. Reid went back to the conference room with Michael Virts and Lisa Caldwell, but Ms. Gayle and Mr. Nwosu had left. They also went to Ms. Gayle's office, but she was not there.

80.     Ms. Reid also reported what transpired during the performance plan meeting with Jessica Greeley, Labor Management Relations (LMR) Specialist. Ms. Reid sought advice on how to preserve her rights and to protect herself from Ms. Gayle's unjustified actions and harassment.

81.     Ms. Gayle rated Ms. Reid's performance "unacceptable" for supposedly failing to meet two critical elements. Ms. Reid believes that the rating was undeserved and in retaliation for protected EEO activities.

> **vi. On August 25, 2014, Ms. Gayle Falsely Accused Ms. Reid of Misconduct, Placed Her on Indefinite Administrative Leave, Confiscated Her Government Credentials and Escorted Her Out of the Building.**

82.     On August 25, 2014, Ms. Reid attended a Society of Government Economist meeting. Upon return from the meeting, Ms. Reid's PIV card would not permit her to re-enter the DOT building. Ms. Reid approached Security about the matter, and they informed her to wait for someone from the Agency to arrive to give her a document.

83.     Mr. Lee, Human Resources Specialist, meet with Ms. Reid and he presented her with a document, signed by Mr. Tuccillo, immediately placing her on indefinite administrative leave.

84.     Ms. Reid was shocked by this action and even more disturbed by the accusations made against her. According to the document she received from Mr. Lee, Ms. Gayle had wrongly accused Ms. Reid of misconduct during the August 21, 2014, unacceptable performance meeting, falsely stating that Ms. Reid remarked during the meeting, "Remember the Navy Yard."

85.     Ms. Reid denies threatening Ms. Gayle either verbally or physically. And, although the performance meeting occurred four (4) days earlier on Thursday, August 21, 2014, no one had contacted Ms. Reid about the allegation, discussed the issue with her or tried to get her side of what transpired at the meeting.

86.     Ms. Gayle had a history of harassing Ms. Reid and retaliating against her because of her EEO protected activities. The accusations against Ms. Reid concerning the August 25, 2014, meeting were part of the same ongoing and continuing threats by Ms. Gayle. Additionally, the indefinite administrative leave was a personnel action taken against Ms. Reid to further chill and discourage her protected EEO activities.

87.     Ms. Reid further believes that the record demonstrates that Ms. Gayle's contemporaneous actions on August 21, 2014 contradict the assertion that Ms. Gayle felt intimidated and/or raise credibility issues.

88.     In particular, Ms. Reid immediately contacted DOT security after the August 21, 2014 meeting. Ms. Reid, unlike Ms. Gayle, felt harassed by Ms. Gayle's actions and the unfair issuance of an unacceptable performance rating. Ms. Reid sought immediate assistance from DOT security to deal with the situation, whereas Ms. Gayle did not.

89.     When Ms. Reid left the conference room with the performance appraisal, neither Ms. Gayle nor Mr. Nwosu called security. Instead, they continued to remain seated in the conference room after Ms. Reid left, hardly the actions of people allegedly in fear of harm.

90.     Ms. Gayle eventually visited Mr. Lee in HR to inform him that she was going home. Conspicuously, Ms. Gayle did not tell Mr. Lee that she felt threatened. Ms. Gayle did not ask Mr. Lee to call Security.

91.     Mr. Lee later testified that Ms. Gayle did not tell him at that time on August 21, 2014, any of the details about her interaction with Ms. Reid. These are not the reactions of someone who claims she was afraid of alleged misconduct by Ms. Reid.

92.     If Ms. Gayle or Mr. Nwosu had feared for their personal safety, they would have acted quite differently on August 21, 2014 and would have attempted to let others know they felt intimidated, which they did not do.

93.     When later called to testify, Mr. Nwosu was asked if he felt threatened, to which he responded "no." Mr. Nwosu also testified that he had never seen Ms. Reid act in a violent manner and had no reason to think she would be violent.

94.     Ms. Gayle and Mr. Nwosu's failure to act on August 21, 2014 at the time the alleged incident occurred, evidences a lack of concern about their immediate safety. Their inaction is inconsistent with Ms. Gayle's false assertion that she had been subjected to a threat of harm by Ms. Reid.

95.     Rather, Ms. Reid, who had requested official duty time on numerous occasions to assist union employees with EEO matters, as well as had filed pending EEO and other complaints against Ms. Gayle and the Agency, was unfairly issued a disciplinary action and placed on administrative leave as part of an ongoing and unremitting pattern of retaliatory harassment.

96.     Also, of note, is the fact that Ms. Reid, in her role as the elected Executive Vice President

of Local 3313, was involved in a prominent and renowned class action case against the Agency

seeking damages for overtime violations involving millions of dollars in damages. This grievance

was filed on July 30, 2014 and delivered to Mr. Lee approximately three weeks before Mr. Lee

and other Agency officials placed Ms. Reid on administrative leave for alleged disruptive conduct.

97.     Additionally, the Agency has treated other similarly situated employees differently. Upon

information and belief, Ms. Reid believes at least two other male DOT employees were accused

of making threatening remarks but were not treated as harshly or in the same manner as Ms. Reid.

### vii. On August 25, 2014, and Continuing, the Agency Denied Ms. Reid Access to Her Office Email Account.

98.     As stated previously, on August 25, 2014, Mr. Tuccillo placed Ms. Reid on administrative

leave based upon disputed and false accusations made by Ms. Gayle. The only communication

Ms. Reid received from the Agency regarding this unfair personnel action was a written

notification handed to her by Mr. Lee.

99.     Uncertain about her employment status and the extent of the restrictions the Agency might

impose, on August 25, 2014, Ms. Reid attempted to access her work email from a remote location

and could not log into her account.

100.    Ms. Reid was not given any written notice that her access to her email account was

terminated, or suspended, and was not given a reason for the action. Although Ms. Reid was placed

on administrative leave, she had not been accused of any information technology misconduct. Ms.

Reid believes the Agency had no basis for blocking her email and should not have done so because

they were not alleging any computer misconduct.

101.    Agency management should have discussed the administrative leave action with Ms. Reid

prior to simply handing her a written memorandum. The Agency failed to explain how her

employment would be impacted because of her change in status, including her access to work email, as well as other conditions and benefits of employment.

102.    Upon information and belief, Office of Personnel Management ("OPM") procedures for administrative leave specify that an individual on administrative leave should be assigned to work in another location. Ms. Reid believes that she should have been allowed to at least telework while the Agency was investigating any alleged misconduct. The Agency never informed Ms. Reid of her rights, or of any limitations in her employment status, due to the imposition of administrative leave.

103.    By locking her email access and blocking her account, Ms. Reid was forced to conduct official business through her personal Yahoo account. This created a chilling effect for Ms. Reid's protected EEO activities and was a strong negative signal to other DOT employees that relied upon Ms. Reid's advocacy. It discouraged not only Ms. Reid, but also other employees from pursuing their rights for fear the Agency would treat them unfavorably as it did Ms. Reid.

### viii. On March 17, 2015, the Agency Denied Ms. Reid Access to the Women's Bathroom at Agency Headquarters.

104.    On March 17, 2015, Ms. Reid and her legal representative, James Moody, attended a meeting at DOT Headquarters to discuss matters related to the Agency's decision to place her on administrative leave. Mr. Lee attended this meeting.

105.    After the meeting concluded, Ms. Reid asked Mr. Lee to use the women's restroom. Mr. Lee responded that she absolutely could not use the restroom because he was responsible for escorting her while she was in the building. Mr. Lee told Ms. Reid to use the restroom at Starbucks instead. Mr. Moody witnessed this exchange between Ms. Reid and Mr. Lee.

106.    Mr. Lee should have allowed Ms. Reid to use the women's restroom at DOT Headquarters. It was a simple request and it would have only involved contacting a female DOT Security officer,

or even another FTA employee, if he had sincere concerns about escorting her while she used the women's restroom.

107.   Mr. Lee was responsible for accommodating all participants during the meeting and did not impose similar restrictions on the Court Reporter that was present at the meeting. DOT employees, and visitors, are allowed access to the restrooms when they are in the building. Ms. Reid was treated in a discriminatory and intimidating manner by Mr. Lee.

108.   Mr. Lee denied Ms. Reid access to the restroom out of antagonism and harassment in retaliation for the EEO and other complaints she filed against the Agency. Ms. Reid's prior EEO activity was a factor in Mr. Lee's conduct because he was aware of her protected activity and was one of the Agency employees involved in responding to her complaints.

## CONCLUSION

109.   Ms. Reid avers that the incidents set forth in the foregoing paragraphs constitute illegal activity under Title VII and that her rights were violated when the Agency retaliated against her because of protected EEO activity; engaged in retaliatory harassing conduct that created a hostile work environment; and discriminated against her because of her sex (female).

110.   Additionally, although Ms. Reid is not asserting a separate cause of action in this Complaint for her termination, it is highly relevant to note that, as a result of separate Arbitration and/or MSPB proceedings, the Agency's articulated legitimate and nondiscriminatory reasons for its actions were determined to lack credibility. This thereby demonstrates that the Agency's actions against Ms. Reid, as set forth herein, are false, disputed, pretext for illegal discrimination and taken against Ms. Reid to harass her because of pending EEO complaints and other protected activity against the Agency.

111.    The Agency's actions as alleged herein had a significant negative impact on the terms and conditions of Ms. Reid's employment. In particular, the harassment by Ms. Gayle, culminating in the false allegations of misconduct against Ms. Reid during the August 21, 2014 meeting, has had substantial negative financial and emotional ramifications for Ms. Reid.

112.    As a direct and proximate result of the unlawful acts of the Agency and/or agents or employees acting on its behalf, Ms. Reid has suffered grievous harm to her professional career. This harm includes, but is not limited to, loss of professional status, loss of career-enhancing opportunities, loss from unpaid leave status, loss of other leave and/or other financial losses arising from the claims herein.

113.    As a direct and proximate result of the actions by the Agency and/or agents or employees acting on its behalf, Ms. Reid has suffered from emotional distress arising from the hostile work environment, damage to her professional reputation, and stress and anxiety caused by the harassment.

## EXHAUSTION OF REMEDIES

114.    Ms. Reid has exhausted all administrative requirements that apply to the processing of her complaint, including the filing of informal and formal complaints with the Agency's EEO office, consolidated EEOC proceedings and the OFO Case which issued a decision and Right to File on February 14, 2020.

## STATEMENT OF CLAIMS

### COUNT I:   The Agency Retaliated Against Ms. Reid for Engaging in Protected EEO Activity in Violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*.

115.    Ms. Reid adopts and incorporates by reference all averments in the foregoing paragraphs.

116.    Title VII prohibits federal agencies from retaliating against its employees for complaining about practices which the employee reasonably and in good faith believes are discriminatory.

117.    Ms. Reid engaged in protected activities by opposing the Agency's discriminatory actions against her and by filing several EEO complaints of discrimination. Ms. Reid also served as an elected Union Official. In that capacity, Ms. Reid filed and successfully resolved numerous EEOC cases on behalf of her constituent members.

118.    The Agency and the responsible management officials, including Ms. Gayle, Ms. Mattice, Mr. Tuccillo and Mr. Lee were aware of Ms. Reid's protected activities.

119.    Defendant, DOT, was, at all times relevant to this matter, the employer of Ms. Reid for all purposes under Title VII.

120.    The Agency, and responsible management officials acting on its behalf, including Ms. Gayle, Ms. Mattice, Mr. Tuccillo and Mr. Lee engaged in the following retaliatory actions against Ms. Reid:

> •In January 2013, Ms. Reid had to use annual leave to make a work-related presentation to TRB;
> •The Agency interfered with Ms. Reid's attendance at the TRB in January 2014 by making her participation at the meeting contingent upon submission of an update to a non-urgent assignment;
> •Since August 2013 and continuing, the Agency removed Ms. Reid's specific job duties related to the Agency's Financial Programs;
> •In March 2014, the Agency obstructed Ms. Reid's request for official time to assist an employee with an EEO Complaint;
> •On April 16, 2014, the Agency issued a Letter of Caution to Ms. Reid;
> •During a performance evaluation meeting on August 21, 2014, the Agency issued an "Unacceptable" rating to Ms. Reid;
> •On August 25, 2014, the Agency falsely accused Ms. Reid of misconduct and placed her on indefinite administrative leave;
> •On August 25, 2014, and continuing, the Agency denied Ms. Reid access to her office Email account; and
> •On March 17, 2015, the Agency denied Ms. Reid access to the women's bathroom at Agency Headquarters.

121.    The Agency knew and was aware of Ms. Reid's protected activities at the time of these adverse actions and therefore violated Title VII, 42 U.S.C. §2000e.

122.     Ms. Reid additionally alleges that the Agency and/or agents or employees acting on its behalf, including Ms. Gayle, Ms. Mattice, Mr. Tuccillo and Mr. Lee, subjected her to adverse and disparate treatment in retaliation for her participation in protected activity.  Ms. Reid further alleges that these acts and practices violate Title VII as well as the statutory provisions and regulations that specifically apply to the federal government as an employer.

123.     The Agency, and responsible management officials acting on its behalf, including Ms. Gayle, Ms. Mattice, Mr. Tuccillo and Mr. Lee, treated Ms. Reid differently and less favorably because of her protected activities.

124.     As a direct and proximate result of the unlawful acts of the Agency and/or agents or employees acting on its behalf, including Ms. Gayle, Ms. Mattice, Mr. Tuccillo and Mr. Lee, Ms. Reid has sustained considerable injury and suffered grievous harm to her professional career.  This harm includes, but is not limited to, loss of professional status, loss of career-enhancing opportunities, loss from unpaid leave status, loss of other leave and/or other financial losses arising from the claims herein.

125.     As a direct and proximate result of the unlawful acts of the Agency and/or agents or employees acting on its behalf, including Ms. Gayle, Ms. Mattice, Mr. Tuccillo and Mr. Lee, Ms. Reid has suffered from emotional distress. This harm includes, but is not limited to, damage to her professional reputation and stress and anxiety caused by the retaliation and resultant financial hardship arising from the claims herein.

126.     The unlawful acts of the Agency and/or agents or employees acting on its behalf, including Ms. Gayle, Ms. Mattice, Mr. Tuccillo and Mr. Lee, have caused Ms. Reid embarrassment, humiliation and indignity, as well as damage to her professional reputation and career.  This harm

includes, but is not limited to, a loss of professional status, career-enhancing and advancement opportunities as a result of being retaliated against.

127.    As a direct and proximate result of the unlawful acts the Agency and/or agents or employees acting on its behalf, including Ms. Gayle, Ms. Mattice, Mr. Tuccillo and Mr. Lee, among others, Defendant is additionally liable to Ms. Reid for those damages, as well as for attorneys' fees, the costs of this litigation, and accrued interest.

128.    Ms. Reid does not make any claim or cause of action in this Complaint related to her removal from federal service.

129.    Ms. Reid does not seek any damages or loss arising from, or related to, her removal from federal service in this Complaint.

130.    Ms. Reid files this Complaint exclusively and solely to pursue only those claims, issues and damages raised, and related to, the OFO Case and the related EEO/EEOC proceedings.

### COUNT II:  The Agency Created a Hostile Work Environment and Harassed Ms. Reid Based on Reprisal/Retaliation in Violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq.

131.    Ms. Reid adopts and incorporates by reference all averments in the foregoing paragraphs.

132.    Title VII prohibits federal agencies from creating a hostile work environment or engaging in harassment against its employees because of participation in protected activities (reprisal/retaliation).

133.    Ms. Reid engaged in protected activities by opposing the Agency's discriminatory actions against her and by filing several EEO complaints of discrimination. Ms. Reid also served as an elected Union Official. In that capacity, Ms. Reid filed and successfully resolved numerous EEOC cases on behalf of her constituent members.

134.    The Agency and the responsible management officials, including Ms. Gayle, Ms. Mattice,

Mr. Tuccillo and Mr. Lee were aware of Ms. Reid's protected activities.

135.    Defendant, DOT, was, at all times relevant to this matter, the employer of Ms. Reid for all

purposes under Title VII.

136.    The Agency, and responsible management officials acting on its behalf, including Ms.

Gayle, Ms. Mattice, Mr. Tuccillo and Mr. Lee, harassed Ms. Reid, created a hostile work

environment and engaged in the following retaliatory actions against Ms. Reid:

> •In January 2013, Ms. Reid had to use annual leave to make a work-related presentation to
> TRB;
> •The Agency interfered with Ms. Reid's attendance at the TRB in January 2014 by making
> her participation at the meeting contingent upon submission of an update to a non-urgent
> assignment;
> •Since August 2013 and continuing, the Agency removed Ms. Reid's specific job duties
> related to the Agency's Financial Programs;
> •In March 2014, the Agency obstructed Ms. Reid's request for official time to assist an
> employee with an EEO Complaint;
> •On April 16, 2014, the Agency issued a Letter of Caution to Ms. Reid;
> •During a performance evaluation meeting on August 21, 2014, the Agency issued an
> "Unacceptable" rating to Ms. Reid;
> •On August 25, 2014, the Agency falsely accused Ms. Reid of misconduct and placed her
> on indefinite administrative leave;
> •On August 25, 2014, and continuing, the Agency denied Ms. Reid access to her office
> Email account; and
> •On March 17, 2015, the Agency denied Ms. Reid access to the women's bathroom at
> Agency Headquarters.

137.    The Agency knew and was aware of Ms. Reid's protected activities at the time of these

adverse actions and therefore violated Title VII, 42 U.S.C. §2000e.

138.    The Agency, and responsible management officials acting on its behalf, including Ms.

Gayle, Ms. Mattice, Mr. Tuccillo and Mr. Lee, created a hostile work environment by making

constant and baseless criticisms, remarks and rebukes that negatively impacted Ms. Reid's

employment; unfairly interfered with her ability to perform her job; and made it more difficult for

her to carry out her duties, all of which damaged and hampered her career.  The harassment made

Ms. Reid's work environment intolerable and hostile. Ms. Reid further alleges that these acts and practices violate Title VII as well as the statutory provisions and regulations that specifically apply to the federal government as an employer.

139.    The Agency, and responsible management officials acting on its behalf, including Ms. Gayle, Ms. Mattice, Mr. Tuccillo and Mr. Lee, treated Ms. Reid differently and less favorably because of her protected activities.

140.    As a direct and proximate result of the unlawful acts of the Agency and/or agents or employees acting on its behalf, including Ms. Gayle, Ms. Mattice, Mr. Tuccillo and Mr. Lee, Ms. Reid has sustained considerable injury and suffered grievous harm to her professional career.  This harm includes, but is not limited to, loss of professional status, loss of career-enhancing opportunities, loss from unpaid leave status, loss of other leave and/or other financial losses arising from the claims herein.

141.    As a direct and proximate result of the unlawful acts of the Agency and/or agents or employees acting on its behalf, including Ms. Gayle, Ms. Mattice, Mr. Tuccillo and Mr. Lee, Ms. Reid has suffered from emotional distress from being harassed and subjected to a hostile work environment because of reprisal. This harm includes, but is not limited to, damage to her professional reputation and stress and anxiety caused by the harassment and resultant financial hardship arising from the claims herein.

142.    The unlawful acts of the Agency and/or agents or employees acting on its behalf, including Ms. Gayle, Ms. Mattice, Mr. Tuccillo and Mr. Lee, have caused Ms. Reid embarrassment, humiliation and indignity, as well as damage to her professional reputation and career.  This harm includes, but is not limited to, a loss of professional status, career-enhancing and advancement

opportunities as a result of being harassed and subjected to a hostile work environment because of reprisal.

143.    As a direct and proximate result of the unlawful acts the Agency and/or agents or employees acting on its behalf, including Ms. Gayle, Ms. Mattice, Mr. Tuccillo and Mr. Lee, among others, Defendant is additionally liable to Ms. Reid for those damages, as well as for attorneys' fees, the costs of this litigation, and accrued interest.

144.    Ms. Reid does not make any claim or cause of action in this Complaint related to her removal from federal service.

145.    Ms. Reid does not seek any damages or loss arising from, or related to, her removal from federal service in this Complaint.

146.    Ms. Reid files this Complaint exclusively and solely to pursue only those claims, issues and damages raised, and related to, the OFO Case and the related EEO/EEOC proceedings.

**COUNT II:  The Agency Discriminated Against Ms. Reid Based on Sex in the Terms and Conditions of Her Employment in Violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq.**

147.    Ms. Reid adopts and incorporates by reference all averments in the foregoing paragraphs.

148.    Title VII prohibits federal agencies from discriminating against its employees in the terms, conditions and privileges of employment because of sex.  Ms. Reid is a female.

149.    Defendant, DOT, was, at all times relevant to this matter, the employer of Ms. Reid for all purposes under Title VII.

150.    The Agency, and responsible management officials acting on its behalf, including Ms. Gayle, Ms. Mattice, Mr. Tuccillo and Mr. Lee, engaged in the following discriminatory actions against Ms. Reid:

•In January 2013, Ms. Reid had to use annual leave to make a work-related presentation to TRB;

- 30 -

•The Agency interfered with Ms. Reid's attendance at the TRB in January 2014 by making her participation at the meeting contingent upon submission of an update to a non-urgent assignment;

•Since August 2013 and continuing, the Agency removed Ms. Reid's specific job duties related to the Agency's Financial Programs;

•In March 2014, the Agency obstructed Ms. Reid's request for official time to assist an employee with an EEO Complaint;

•On April 16, 2014, the Agency issued a Letter of Caution to Ms. Reid;

•During a performance evaluation meeting on August 21, 2014, the Agency issued an "Unacceptable" rating to Ms. Reid;

•On August 25, 2014, the Agency falsely accused Ms. Reid of misconduct and placed her on indefinite administrative leave;

•On August 25, 2014, and continuing, the Agency denied Ms. Reid access to her office Email account; and

•On March 17, 2015, the Agency denied Ms. Reid access to the women's bathroom at Agency Headquarters.

151.    Ms. Reid additionally alleges that the Agency and/or agents or employees acting on its behalf, including Ms. Gayle, Ms. Mattice, Mr. Tuccillo and Mr. Lee, discriminated against her because of her sex and subjected her to adverse and disparate treatment.  Ms. Reid further alleges that these acts and practices violate Title VII as well as the statutory provisions and regulations that specifically apply to the federal government as an employer.

152.    The Agency, and responsible management officials acting on its behalf, including Ms. Gayle, Ms. Mattice, Mr. Tuccillo and Mr. Lee, discriminated against Ms. Reid and treated her differently and less favorably because of her sex.

153.    As a direct and proximate result of the unlawful acts of the Agency and/or agents or employees acting on its behalf, including Ms. Gayle, Ms. Mattice, Mr. Tuccillo and Mr. Lee, Ms. Reid has sustained considerable injury and suffered grievous harm to her professional career.  This harm includes, but is not limited to, loss of professional status, loss of career-enhancing opportunities, loss from unpaid leave status, loss of other leave and/or other financial losses arising from the claims herein.

154.    As a direct and proximate result of the unlawful acts of the Agency and/or agents or employees acting on its behalf, including Ms. Gayle, Ms. Mattice, Mr. Tuccillo and Mr. Lee, Ms. Reid has suffered from emotional distress. This harm includes, but is not limited to, damage to her professional reputation and stress and anxiety caused by the discrimination and resultant financial hardship arising from the claims herein.

155.    The unlawful acts of the Agency and/or agents or employees acting on its behalf, including Ms. Gayle, Ms. Mattice, Mr. Tuccillo and Mr. Lee, have caused Ms. Reid embarrassment, humiliation and indignity, as well as damage to her professional reputation and career.  This harm includes, but is not limited to, a loss of professional status, career-enhancing and advancement opportunities as a result of being discriminated against.

156.    As a direct and proximate result of the unlawful acts the Agency and/or agents or employees acting on its behalf, including Ms. Gayle, Ms. Mattice, Mr. Tuccillo and Mr. Lee, among others, Defendant is additionally liable to Ms. Reid for those damages, as well as for attorneys' fees, the costs of this litigation, and accrued interest.

157.    Ms. Reid does not make any claim or cause of action in this Complaint related to her removal from federal service.

158.    Ms. Reid does not seek any damages or loss arising from, or related to, her removal from federal service in this Complaint.

159.    Ms. Reid files this Complaint exclusively and solely to pursue only those claims, issues and damages raised, and related to, the OFO Case and the related EEO/EEOC proceedings.

## RELIEF SOUGHT

**WHEREFORE**, Ms. Reid demands judgment against the Agency and respectfully requests the Court to:

A.      Enter judgment for Ms. Reid against the Agency on all Counts;

B.      Declare that the Agency subjected Ms. Reid to retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended.

C.      Declare that the Agency subjected Ms. Reid to retaliatory harassment and created a hostile work environment in retaliation for engaging in protected activities in violation of Title VII of the Civil Rights Act of 1964, as amended.

D.      Declare that the Agency subjected Ms. Reid to sex discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended;

E.      Award Ms. Reid benefits, entitlements, loss of professional status and career-enhancing opportunities, annual leave, loss of other leave, and other remuneration and privileges of employment retroactive to the date of any unlawful action found to have occurred in this case;

F.      Award Ms. Reid compensatory damages for the injuries and losses that she suffered in an amount to be proved at trial;

G.      Enjoin the Agency from future retaliation and discrimination against Ms. Reid;

H.      Order the Agency to pay all reasonable attorneys' fees, court costs, and expenses Ms. Reid has and will incur as a result of the Agency's actions and inactions, as well as pre-judgment and post-judgment interest; and,

I.      Order such other equitable and legal relief as necessary and appropriate to make Ms. Reid whole.

## JURY DEMAND

Ms. Reid requests a trial by a jury as to all claims set forth in her Complaint.


Respectfully submitted,


_/s/ CAMILLA C. MCKINNEY_____
Camilla C. McKinney, Esq.
D.C. Bar No. 448776
McKinney & Associates, PLLC
1629 K Street, NW, Suite 300
Washington, DC  20006
(202) 470-0935 (telephone)
(877) 590-4777 (facsimile)
CMcKinney@DCEmploymentLawyer.com
**_Attorneys for Plaintiff Robena Reid_**