## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ROBENA G. REID, | |
| *Plaintiff*, | |
| v. | Civil Action No. 20-1262 (TJK) |
| PETE BUTTIGIEG, *in his official capacity as Secretary of Transportation*, | |
| *Defendant*. | |

## <u>MEMORANDUM OPINION</u>

Robena Reid contends that her federal employer tried for years to dissuade her from reporting illegal misconduct. Defendant, her employer, moves for partial summary judgment and otherwise to dismiss her claims, arguing that it has already compensated her for any tangible harm arising from the acts she identifies. Reid does not deny that she was compensated, but instead points to other harms that she says remain unremedied. Because the Court finds that any unremedied harm to Reid is immaterial under the governing law, it grants partial summary judgment to Defendant and dismisses the rest of the complaint.

## I.    Background

Title VII of the Civil Rights Act of 1964 forbids, among other things, retaliation against those who invoke its protections. *See generally Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59–70 (2006). Retaliation is actionable if it "produces an injury or harm." *Id.* at 67. Such harm must be "materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quotation omitted). By contrast, reporting alleged misconduct does not "immunize" a reporter from "petty

slights or minor annoyances." *Id.* Whether a harm is material or petty "will often depend upon the particular circumstances. Context matters." *Id.* at 69.

The facts below are drawn mostly from Reid's complaint and assumed to be true. Where noted, her account is supplemented by other record evidence.

### A. Factual Background

Reid is a financial economist for the Federal Transit Administration, a component of the Department of Transportation. ECF No. 28 ("Compl") ¶ 4. She has worked for the Administration since 1999. Compl. ¶ 12. Several years into her tenure, Kimberly Gayle became Reid's direct supervisor. Compl. ¶¶ 6, 14–16. Most of the relevant events arise from conflicts between Reid and Gayle. *See generally* Compl. ¶¶ 17–21, 30–34.

Reid is also a self-described equal-employment-opportunity "gadfly." ECF No. 32-1 at 6, 10. She has long been "a staunch [antidiscrimination] advocate" on behalf of herself and her colleagues. *Id.* at 6. On her own behalf, Reid filed some kind of complaint in 2006. *See* Compl. ¶¶ 7–8, 66–67. Around the same time, she filed another complaint alleging "harassment/discrimination for a disability and failure to provide reasonable accommodations." *See* Compl. ¶ 20. Reid has also "represented" other Administration employees "in various employment matters . . . , including numerous . . . cases involving Title VII discrimination and retaliation issues." Compl. ¶ 13; *see also* Compl. ¶¶ 17, 21–28, 44–45, 58, 77–78, 98, 103–04, 133–35, 178–80. In many such instances, Reid asked to use "official time"—that is, time for which she was paid—on those activities. *See* Compl. ¶¶ 13, 40, 103.

Reid believes her superiors wished to dissuade that activity. When Gayle became Reid's supervisor, other managers told Gayle that Reid was a "'problem' employee because she filed numerous complaints." Compl. ¶ 18. Reid describes many of her complaints as having been asserted "against" Gayle and other managers. Compl. ¶ 28. Gayle also complained about the number

of challenges Reid filed or helped file and claimed Reid was filing them to "intimidate" her. Compl. ¶ 48.  Another manager described the time Reid spent on complaints as "exorbitant" and stated that Reid "does that over her job as much as she can."  Compl. ¶ 49.

Shortly after Gayle became Reid's supervisor, the relationship between them "deteriorated."  Compl. ¶ 47.  Reid attributes that decline to the fact that she is "ardent and passionate in her efforts to protect employee rights."  *Id.*  Gayle had the final say over whether Reid could use official time to assist other employees with complaints or for any other purposes.  *See* Compl. ¶¶ 83, 107.  That authority spawned much conflict between Gayle and Reid.

Twice, Gayle denied Reid's requests to use official time to deliver work-related presentations.  A few months before an industry conference, Reid shared her plans to deliver a presentation, which she believed had been approved.  Compl. ¶¶ 51–53, 64.  But in the lead-up to the presentation, Gayle made clear that she considered a poster that Reid had made for the presentation to be unapproved.  Compl. ¶¶ 55–57.  While she was considering Reid's request to use official time on that presentation, Gayle also reviewed some of Reid's requests to use official time to file antidiscrimination complaints.  Compl. ¶¶ 54, 58–59.  Gayle also "consulted" another manager about Reid's requests.  Compl. ¶ 60.  Ultimately, Gayle told Reid "she was not authorized to give her poster presentation while on duty time."  Compl. ¶ 63.

That decision, Reid says, "forced" her to use four hours of annual leave instead.  Compl. ¶ 64.  But the presentation was substantively related to Reid's work, and it helped her achieve an industry recertification.  *See* Compl. ¶¶ 69–72.  And Reid was the sole Administration employee "who was required to take leave to present."  Compl. ¶¶ 74–75.  Reid thus believes that her official-time request was denied to punish her for her complaint-related official-time requests.  Compl.

¶ 76. So Reid filed a new equal-employment-opportunity complaint about that alleged "reprisal." Compl. ¶ 79.

A similar incident happened the next year. Reid timely expressed a desire to attend the same work-related conference. Compl. ¶ 87. But Gayle refused to approve an official-time request until Reid completed an unrelated assignment. Compl. ¶¶ 88–89. No other Administration employee's attendance at the conference was conditioned on completing a work assignment. Compl. ¶ 90. Because the conference began on a Sunday and Gayle did not confirm whether Reid was allowed to attend by the end of the workweek, Reid was unsure about the status of her request when the conference started. Compl. ¶¶ 89, 91–92. Other employees, though, got official-time credit for attending on both Sunday and Monday. *See* Compl. ¶¶ 95–96.

Gayle again eventually denied Reid's request. Compl. ¶¶ 95, 97. In the period between the two conferences—and on top of the new retaliation complaint on her own behalf—Reid continued to help other employees file complaints. Compl. ¶¶ 77–78, 82. Again, Gayle discussed Reid's use of official time with another manager. *See* Compl. ¶¶ 84–86. Reid thus believes that Gayle conditioned and then denied her request to use official time to attend the conference to punish Reid for participating in complaints against the Administration. Compl. ¶ 85.

A few months later, Gayle denied another of Reid's official-time requests. This time, Reid asked to use seven hours to help a colleague file a complaint. Compl. ¶ 98. Gayle told Reid she wished to discuss an assignment with her at the proposed time, so she denied the request. Compl. ¶¶ 99–100. But Reid says the assignment was not "urgent" and that, for various reasons, the assignment was not ripe for release. Compl. ¶¶ 101–02. She complains that this denial discouraged her from helping colleagues file complaints. Compl. ¶ 107.

The conflicts escalated from there.  Soon after Gayle denied that official-time request, Reid and Gayle met to discuss an assignment.  *See* Compl. ¶¶ 111, 114–16.  According to Gayle, Reid was "loud," "defiant," and "aggressive[ ]" in that meeting.  Compl. ¶ 115.  But Reid disputes that characterization.  Compl. ¶¶ 116–18.  And on the same day, Gayle learned that she would need to provide an affidavit in an investigation into one of Reid's complaints.  Compl. ¶ 112.

Two weeks after that meeting and affidavit request, Gayle sent Reid a "Letter of Caution."  Compl. ¶ 119.  The letter threatened Reid with "corrective action."  Compl. ¶¶ 121–22.  Reid believes that Gayle sent the letter to dissuade her from filing discrimination complaints, in part because an agency "Human Resource Specialist" later said the letter's impetus was Reid's "exorbitant" official-time requests to "represent people in their . . . complaints."  Compl. ¶ 123.

The conflict between Gayle and Reid came to a head during Reid's performance review that year.  Reid recounts many details, but the upshot is that Gayle rated Reid's performance "unacceptable" in part because Reid "was not sufficiently focused on her work."  Compl. ¶ 132.  Right before that review, Reid continued to participate in filing complaints, including by requesting that Gayle allow her to use official time to do so.  Compl. ¶¶ 125, 133–35.  Gayle also had met with other managers to discuss Reid's use of official time and invited another manager to sit in on Reid's review.  *See* Compl. ¶¶ 125–28.  The discord at the meeting led Reid to inform agency security that "she felt threatened and harassed" by Gayle.  Compl. ¶ 131.  Gayle, in turn, leveled a similar accusation based on an alleged (and disputed) remark that the Court construes as a reference to a work-related mass shooting.  *See* Compl. ¶ 140.[1]  Reid also alludes to an accusation about

---

[1] Plaintiff's complaint relays the alleged remark as, "Remember the Navy Yard."  Compl. ¶¶ 140, 158.  Elsewhere in the record, the alleged remark is recorded as "Remember the Navy Yard shooting."  ECF No. 25-1 ¶ 21.  The attributed comment thus appears to refer to the mass shooting where a government contractor killed a dozen people at his military workplace.  *See generally*

an offensive "hand gesture."  Compl. ¶ 158.[2]

Whatever happened at the performance-review meeting, the Administration put Reid on administrative leave four days later.  *See* Compl. ¶¶ 136–39.  The Administration did not warn Reid that it would do so; it disabled her building access while she was attending a meeting over lunch.  *See id.*  While she was on administrative leave, the Administration did not permit Reid to access her work email remotely.  *See* Compl. ¶¶ 147–48.  Reid believes both steps were retaliatory.  *See* Compl. ¶¶ 151–52.  She explains that she had information in her email account related to pending antidiscrimination complaints (both hers and her colleagues') and that her having to use her personal email both made it harder for her colleagues to contact her for help and served as a visible reminder of the consequences of complaining.  *See* Compl. ¶¶ 151–55.  The Administration's procedures, she thinks, did not require her email access to be suspended.  *See* Compl. ¶ 150.

After several months of administrative leave, Gayle proposed terminating Reid's employment.  Compl. ¶ 157.  Another official later approved that termination.  Compl. ¶ 176.  But the same official, like Gayle, "had knowledge" of Reid's prior activism.  Compl. ¶ 177.  In fact, he was "involved in" cases in which Reid had helped colleagues file complaints.  Compl. ¶¶ 178–80.  Reid thus considers him "bias[ed]" against her.  Compl. ¶ 181.

The Administration later "retracted" that firing.  Compl. ¶ 182.  So Gayle tried again, for the same reasons as before.  *See* Compl. ¶¶ 198–200.  Another official approved that termination too.  Compl. ¶ 204.  And again, that approving official knew about Reid's reputation and proclivity

---

Michael S. Schmidt, *Gunman Said Electronic Brain Attacks Drove Him to Violence, F.B.I. Says*, N.Y. Times (Sept. 25, 2013), https://www.nytimes.com/2013/09/26/us/shooter-believed-mind-was-under-attack-official-says.html.

[2] The record explains that Gayle claimed that Plaintiff "became visibly angry . . . stood up, pointed in a fashion that reasonably could be interpreted as a gun, and said, 'Remember the Navy Yard Shooting?'"  ECF No. 25-1 at 34; *see also id.* at 27, 202.

for protest.  Compl. ¶¶ 205–06.  Reid attributes the second firing to the same retaliatory animus that she says motivated the first.  *See* Compl. ¶ 209.

The Administration also retracted the second firing.  Compl. ¶ 208.  Gayle thus tried yet again, and again she briefly succeeded.  Compl. ¶ 211.  But once more—for reasons outside the scope of this case—Reid's employment was "restored."  Compl. ¶ 211.[3]  So as of the filing of the operative complaint, Reid still works at the Administration.

During that ping-ponging series of firings and retractions, the Administration also denied Reid a scheduled pay raise.  Compl. ¶ 183.  It based that denial on Gayle's assessment that Reid's work performance was "unacceptable."  Compl. ¶ 184.  Reid believes that assessment was flawed because legitimate obstacles prevented her from completing the assignments used to justify that rating.  *See* Compl. ¶¶ 186–95.  That denied raise, she explains, also "impacted her employment benefits for" years.  Compl. ¶ 197.

Despite three attempted firings and a denied pay raise, the Administration believes it has wiped that slate clean.  Not only has it rescinded its firings, ECF No. 25-1 at 48, 78, but it tried to make it as though Reid had "never left [her] position," *id.* at 78.  That is, it gave her back pay and retroactive benefits covering the periods for which she was away from the Administration.  *Id.* at 44–46, 78–80.  It also gave her the pay raise and made it retroactive so it would include back pay and interest.  *See id.* at 107–93.  And it removed references to her termination from her personnel file.  *Id.* at 44, 78.  The Administration did not, however, admit wrongdoing.  *See generally id.*

Reid does not contradict those claims.  *See* ECF No. 32-1 at 11 n.5.  Instead, she highlights other harms stemming from the abortive firings that she says are unremedied: "emotional distress,

---

[3] Plaintiff explains that her complaint "explicitly does not raise any issues, claims[,] or demand for damages" arising from this attempted firing or restoration.  Compl. ¶ 36 (emphasis deleted).

attorneys' fees, and other losses to be proved at trial," *id.*, which may include "damage to her . . . reputation," Compl. ¶ 217.  And she observes that no "tribunal" has "made a determination in [her] favor regarding whether retaliation was an illegal factor that tainted the [Administration's] decision-making."  ECF No. 32-1 at 12.  Also uncovered by those redresses are other allegedly retaliatory decisions, as summarized by Reid's complaint: the two denials of official time to attend conferences, another denial of official time to help a colleague file a complaint, the issuance of the letter of caution, the "unacceptable" performance rating, and the imposition of administrative leave and the accompanying email lockout.  *See* Compl. ¶ 226.

### B.  Procedural History

In May 2020, Reid sued the Secretary of Transportation, alleging that she suffered discrimination and unlawful retaliation and that she was subject to a hostile work environment.  ECF No. 1 ¶¶ 115–59.  Defendant moved to dismiss for failure to state claims, ECF No. 9 at 11–20, and alternatively sought partial summary judgment on putatively unexhausted or untimely aspects of those claims, *id.* at 9–11.  In response, Reid amended her complaint, ECF No. 16, and Defendant reasserted his motion, ECF No. 18.  Reid then sought leave to amend her complaint again, ECF No. 23, which the Court granted, Minute Order of Feb. 4, 2022; *see also* ECF No. 28.  As amended, her complaint asserts only the retaliation claim.  *See* Compl. ¶¶ 221–36.

Defendant now moves to dismiss Reid's Second Amended Complaint.  ECF No. 29.  He says the Court lacks subject-matter jurisdiction over the aspects of Reid's claim that the Administration has already remedied.  *Id.* at 10–11.  He also seeks, alternatively, summary judgment on claims he says are remedied, unexhausted, or otherwise untimely.  *Id.* at 11–13.  In remaining part, he contends that Reid has failed to state claims because her unremedied allegations are *de minimis* and, alternatively, because her allegations do not plausibly imply that the Administration retaliated against Reid for protected activity.  *Id.* at 13–19.

## II.     Legal Standards

Defendant's Motion relies on Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 56.

Under Rule 12(b)(1), a plaintiff has the burden to establish the Court's subject-matter jurisdiction. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006).  Among other things, that means showing "standing for each claim [a plaintiff] seeks to press and for each form of relief that is sought." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (quotations omitted).  In evaluating its jurisdiction at the pleading stage, the Court generally should "assume the truth of all material factual allegations in the complaint and . . . grant[ Plaintiff] the benefit of all inferences that can be derived from the facts alleged." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quotation omitted).  But the Court may consider the allegations in a plaintiff's complaint, undisputed facts in the record, and, if necessary, its resolution of disputed facts. *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003).

Under Rule 12(b)(6), a plaintiff's complaint must "contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted).  A claim is plausible if "it contains factual allegations that, if proved, would allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (quotation omitted).  Again, the Court must "accept all the well-pleaded factual allegations of the complaint as true and draw all reasonable inferences from those allegations in the plaintiff's favor." *Id.* (quotation omitted).  But it must disregard "a legal conclusion couched as a factual allegation." *Cason v. NFL Players Ass'n*, 538 F. Supp. 3d 100, 109 (D.D.C. 2021) (quotation omitted).

When moving to dismiss under Rule 12(b)(6), parties may also present "matters outside the pleadings."  Fed. R. Civ. P. 12(d).  If the Court considers those matters, "the motion must be treated as one for summary judgment under Rule 56." *Id.*  In that event, the Court may grant

judgment to the moving party if "both sides had a reasonable opportunity to present evidence and there are no genuine issues of material fact." *Wiley v. Glassman*, 511 F.3d 151, 160–61 (D.C. Cir. 2007); *see also* Fed. R. Civ. P. 12(d), 56.  A fact dispute is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact dispute is genuine if the evidence would permit a "reasonable jury [to] return a verdict for the nonmoving party." *Id.*  That procedure does not apply to motions under Rule 12(b)(1), which do not restrict the Court to the face of the complaint anyway.  *See Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).

## III.   Analysis

As amended, Reid's complaint asserts only a retaliation claim.  *See* Compl. ¶¶ 221–36. That claim is based on all of the allegedly retaliatory actions already discussed, including the now-rescinded terminations and denial of a pay raise.  *See* Compl. ¶ 226.  Reid seeks these forms of relief: (1) a judgment declaring that the Administration unlawfully retaliated against her, (2) an injunction against "future retaliation and discrimination," (3) "compensatory damages," which the Court understands to refer to the alleged emotional and reputational harms already discussed, (4) "reasonable attorneys' fees, court costs, and expenses," and, perhaps vestigially, (5) "full back and front pay, including salary [and other] benefits . . . retroactive to the date of any unlawful action . . . [and] expungement of her official personnel file."  Compl. at 47–48.

Of course, the Court cannot address her claim unless it first determines that it has subject-matter jurisdiction.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).  So it begins by explaining why Reid has established that she has standing to seek each form of relief requested in her complaint.

A.     **The Court Has Subject-Matter Jurisdiction Because Reid Identifies Aspects of Her Claims that Are Not Satisfied**

The Court's jurisdiction is limited to "actual cases or controversies."  *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 37 (1976); *see also* U.S. Const. art. III, § 2.  Among other things, a live case or controversy requires that a party retains a "concrete interest, however small, in the outcome of the litigation."  *See Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160–61 (2016) (quotation omitted).  "The doctrine of standing generally assesses whether that interest exists at the outset" of litigation.  *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021).  The Supreme Court has long recognized that litigants lack standing to bring claims where a claimant already "has obtained everything that [she] could recover . . . by a judgment . . . in [her] favor."  *California v. San Pablo & Tulare R.R. Co.*, 149 U.S. 308, 314 (1893).  Under that doctrine, "a complaint filed in federal court cannot include" claims that have already been "satisfactorily resolved in [a claimant's] favor."  *Payne v. Salazar*, 619 F.3d 56, 60–61 (D.C. Cir. 2010).

Defendant says that principle divests the Court of jurisdiction here.  He explains that Reid "lacks standing for any claim for the . . . removals and the denial of a . . . pay increase because the agency's rescission of these actions means it resolved those claims in her favor."  ECF No. 29 at 10 (citing *Payne*, 619 F.3d at 61).  He thus contends that the Court must dismiss Reid's claim under Rule 12(b)(1) insofar as it arises from those events.  *Id.* at 11.

The Court disagrees.  Although the parties agree that the Administration rescinded those actions, scrubbed her files of references to them, and gave Reid back pay and interest—and even if there were such a dispute, the record amply supports such a finding—that does not mean her claim is fully resolved such that she lacks a concrete interest.  Reid claims that, among other things, the Administration must compensate her for emotional and reputational harms arising from the same events.  *See* Compl. ¶ 217.  The Administration has not compensated her for those demands,

and so the Court cannot conclude that her claim has been "satisfactorily resolved." *Payne*, 619 F.3d at 61.  To whose satisfaction could that legal standard refer if not Reid's?

*Payne* illustrates why Reid's claim should not be dismissed for lack of subject-matter jurisdiction.  There, the plaintiff did not *wish* to bring her already-successful claim.  *See Payne*, 619 F.3d at 58–59.  But the government argued she had to bring that claim alongside another that she wished to assert because she had brought both claims during administrative proceedings, and it argued judicial review of an agency decision was "an all-or-nothing proposition."  *Id.* at 60 (quotation omitted).  In rejecting that contention, the D.C. Circuit mentioned that federal courts lack jurisdiction over claims where no relief remains contested.  *See id.* at 61.  But it knew the claim had been "satisfactorily resolved" because the plaintiff did not "*believe herself* aggrieved."  *See id.* (emphasis added).  Not so here.

Other analogous cases involved offers to pay all damages a plaintiff sought.  The Supreme Court has, for example, confronted claims of mootness when a defendant tenders a settlement offer that "fully satisfies a plaintiff's claim."  *E.g.*, *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72–73 (2013) (assuming without deciding that such an offer renders a Fair Labor Standards Act collective action moot).  In such cases, defendants structured offers of judgment to satisfy everything—including costs and, where available, attorney's fees—that plaintiffs had identified as their damages.  *See, e.g.*, *id.* at 69–70; *Campbell-Ewald*, 577 U.S. at 157–58.  That is a far cry from crediting a defendant's assessment of what relief has fully "remedied" a plaintiff's claim.  *See* ECF No. 29 at 10.  And anyway, the Supreme Court has clarified that an *unaccepted* offer of judgment, even one for all the relief an individual plaintiff seeks, does not nullify a plaintiff's interest in continuing suit.  *Campbell-Ewald*, 577 U.S. at 162–65.  A plaintiff thus retains some latitude to define the scope of the controversy.  *See id.* at 165.

The rule Defendant invokes is, after all, about adversity between the parties.  The judicial power, as the Supreme Court explained in *San Pablo & Tulare*, is limited to "determining rights of persons or of property which are actually controverted."  149 U.S. at 314.  And it drew that principle from cases in which the Court had refused to decide "feigned" disputes manufactured in hopes of achieving some holding.  *See Lord v. Veazie*, 49 U.S. (8 How.) 251, 255 (1850); *see also, e.g.*, *Am. Wood-Paper Co. v. Heft*, 75 U.S. (8 Wall.) 333, 336 (1869) (A "case should not be heard by this court" if "there would be the same interest [in damages] on both sides.").  But adversity remains on Reid's claim because she demands compensation for emotional and reputational harms that the Administration has not paid and does not wish to pay.  In other words, some damages are "actually controverted."  *San Pablo & Tulare*, 149 U.S. at 314.

Thus, even if Reid is not entitled to the forms of relief she seeks, that is not a jurisdictional defect.  The Supreme Court has warned against "profligate" uses of the term "jurisdiction."  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 510 (2006).  A plaintiff's inability to satisfy "an element of [her] claim for relief" does not vitiate "a court's power to hear a case."  *See id.* at 514–16 (quotation omitted).  If that were so, there would be little if any distinction between dismissals under Rules 12(b)(1) and 12(b)(6).  The distinction between such dismissals is, in this context, the difference between the relief Reid seeks and that to which the law entitles her.

This Court has subject-matter jurisdiction over Reid's claim because she alleges unremedied harms stemming from the challenged acts.  The Court will thus deny Defendant's motion insofar as it seeks dismissal for lack of subject-matter jurisdiction under Rule 12(b)(1).

**B.  Defendant Is Entitled to Partial Summary Judgment Insofar as Reid's Claim Arises from Acts the Administration Has Remedied**

The Court will, however, grant Defendant partial summary judgment on Reid's claim insofar as it arises from the rescinded firings and denied pay raise.

At the outset, the Court finds Reid had adequate notice of Defendant's motion for summary judgment.  Rule 12(d) requires that parties receive "a reasonable opportunity to present all the material that is pertinent to the motion."  In deciding whether a party had such an opportunity before discovery, courts have considered how the movant captioned the motion, whether the motion relies on attached exhibits, and whether the parties have filed statements of material facts under Local Rule 7(h).  *See, e.g.*, *Langley v. Napolitano*, 677 F. Supp. 2d 261, 263 (D.D.C. 2010); *Dean v. Walker*, 876 F. Supp. 2d 10, 12 (D.D.C. 2012).  The goal is to ensure that the court's reliance on matters outside the pleadings does not take the nonmoving party "by surprise." *Tefera v. OneWest Bank, FSB*, 19 F. Supp. 3d 215, 221 (D.D.C. 2014) (quotation omitted).

Reid could not reasonably be surprised at the Court's consideration of Defendant's exhibits showing that the Administration already gave her part of what she seeks.  Defendant captioned his motion, in the alternative, as one for "partial summary judgment," ECF No. 29 at 1, specifically asked for summary judgment on these claims, *id.* at 11–12, and, in doing so, relied on matters outside the pleadings, including his statement of material facts, *id.* at 10–12; *see also* ECF Nos. 25-1, 29-1.  Reid's response acknowledges Defendant's request for partial summary judgment, *see* ECF No. 32-1 at 1, and she filed a counterstatement of material facts, ECF No. 32-2.  Because she had a reasonable opportunity to respond to Defendant's use of matters outside the pleadings, the Court treats Defendant's motion on the merits of Reid's claim vis-à-vis the rescinded firings and denied pay raise as one for summary judgment.

Reid may not, of course, recover for the same harms twice.  Remedies under Title VII should restore wronged parties to the "position where they would have been were it not for the unlawful discrimination." *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 764 (1976) (quotation omitted).  For that reason, "courts can and should preclude double recovery." *See Gen. Tel. Co.*

*of the Nw. v. EEOC*, 446 U.S. 318, 333 (1980).  Summary judgment for an employer is thus appropriate when a plaintiff seeks damages for "the exact injury she was compensated for already." *Buter v. White*, 67 F. Supp. 3d 59, 72 (D.D.C. 2014).

Moreover, the D.C. Circuit has recognized that "[a]n employer may cure an adverse employment action . . . before that action is the subject of litigation." *Taylor v. Small*, 350 F.3d 1286, 1293 (2003).  In *Taylor*, the plaintiff's employer gave her a series of poor performance reviews, which led to a lower bonus.  *Id.*  Although the loss of bonus money is cognizable under Title VII, the Circuit held that her employer cured any violation when it "corrected the evaluation and paid the proper bonus." *Id.* at 1293–94.  Asserting her claims in court required the plaintiff first to bring her claims to an Equal Employment Opportunity counselor and then give the agency time to act on the complaint.  *See Martini v. Fed. Nat'l Mortg. Ass'n*, 178 F.3d 1336, 1347 (D.C. Cir. 1999).  Such an exhaustion requirement would be meaningless, as the D.C. Circuit explained, if "a plaintiff were permitted a right to sue even if his or her employer had corrected the grievance." *Taylor*, 350 F.3d at 1294 (quotation omitted).

Reid points out that *Taylor* was decided under the discrimination standard—"adverse action"—not the retaliation standard—"materially adverse."  ECF No. 32-1 at 13 n.8.  That distinction matters in some contexts, but not here.  *See generally Chambers v. District of Columbia*, 35 F.4th 870, 876–77 (D.C. Cir. 2022) (en banc) (comparing the two types of claims).  Retaliation claims are subject to an exhaustion requirement too.  *See Tyes-Williams v. Whitaker*, 361 F. Supp. 3d 1, 10–11 (D.D.C. 2019) (citing 42 U.S.C. § 2000e-16(c) and 29 C.F.R. § 1614.105(a)(1)).  Allowing Reid to assert such a claim based on harms for which she already got compensation would no less "undermine" Congress's "policy of encouraging informal resolution" during the exhaustion period, *Murthy v. Vilsack*, 609 F.3d 460, 464 (D.C. Cir. 2010) (quotation omitted), than it would

have in *Taylor*.  And the legal standard for assessing whether acts are concrete enough to constitute retaliation is irrelevant to whether a plaintiff's damages have been remedied.  Both rationales for granting summary judgment thus apply with full force.

There is no genuine dispute about whether the Administration already gave Reid the back pay, benefits, and expungement she seeks.  Defendant has submitted the Administration's employment records showing that.  ECF No. 25-1 at 44–46, 78–80, 107–93.  And Reid does not say otherwise.[4]  Thus, there is no evidence from which a "reasonable jury" could find that the Administration failed to render to Reid the back pay, retroactive benefits, and expungement associated with nullifying the two attempted firings and the denied pay raise.  *See Anderson*, 477 U.S. at 248; *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 150–51 (D.C. Cir. 1996) (holding that a nonmoving party must "point[ ] to 'affirmative evidence' showing disputed material facts" to survive a summary-judgment motion (quoting *Anderson*, 477 U.S. at 256–57)).

Reid gestures at alleged emotional or reputational harms to try to preserve her claim, but ultimately, she comes up well short of the mark.  She is right that reinstatement and a retroactive raise with back pay and interest do not automatically cure any past retaliation.  Retaliation via "a diminution in pay or benefits" can still qualify as a materially adverse action "even when the employer later provides back pay."  *Greer v. Paulson*, 505 F.3d 1306, 1317–18 (D.C. Cir. 2007).  That is because even a temporary loss of "cash flow can cause serious financial hardship."  *Spector v. District of Columbia*, No. 17-CV-1884 (CJN), 2020 WL 977983, at *11 (D.D.C. Feb. 28, 2020).

---

[4] Reid deflected in response to that evidence by noting that "Defendant has not compensated [her] for emotional distress, attorneys' fees, and other losses to be proved at trial."  ECF No. 32-1 at 11 n.5.  Later, she explains that she also still needs an injunction against further retaliation and a declaratory judgment.  *Id.* at 11–13 & n.6.  But her statement of disputed facts, submitted in response to Defendant's statement, *see* LCvR 7(h)(1), does not even mention the Administration's reparative actions.

It is thus conceivable that any hardship resulting from such a retaliatory act, including consequent emotional harms, could remain remediable and prevent summary judgment. *See* 42 U.S.C. § 1981a(a)–(b) (permitting a plaintiff to recover for, among other things, "emotional pain").[5]

But Reid has provided no evidence—or even specific allegations—of such harms linked to the specific allegedly retaliatory acts that the Administration remedied through back pay, benefits, and expungement. Reid "bears the burden of proving she suffered noneconomic injuries such as emotional distress, pain and suffering, [and] reputational harm." *Jean-Baptiste v. District of Columbia*, 931 F. Supp. 2d 1, 14 (D.D.C. 2013). Such harms "cannot be presumed." *Peyton v. DiMario*, 287 F.3d 1121, 1126 (D.C. Cir. 2002). Because Reid opposes Defendant's motion for summary judgment based on these harms, she needs "affirmative evidence," *Jackson*, 101 F.3d at 150–51, that she, for example, "became depressed, angry, and suffered a loss of self-esteem" on account of these specific allegedly retaliatory acts. *Peyton*, 287 F.3d at 1126. Instead, she simply offers a vague reference, buried in a footnote in her opposition, that she suffered "emotional distress." ECF No. 32-1 at 13 n.8. That won't do. She has failed to provide "evidence on which the jury could reasonably find" that she experienced such harm related to these specific allegations. *Anderson*, 477 U.S. at 252.

Nor can attorney's fees help Reid here. Title VII allows courts to award attorney's fees to the "prevailing party" in a civil action. 42 U.S.C. § 2000e-5(k). Such fees thus enter the picture only once a party has prevailed—they cannot be the basis for a party's prevailing. *Cf. Doe v.*

---

[5] Emotional distress or reputational damage cannot themselves serve to make an alleged retaliatory action materially adverse, such that a plaintiff may base a retaliation claim on them. *See EEOC v. Fox News Network, LLC*, 806 F. Supp. 2d 128, 137 (D.D.C. 2011) ("Emotional distress and other purely subjective injuries . . . have been consistently rejected in our Circuit as legally sufficient to constitute a materially adverse action . . . ."); *Rhone v. U.S. Capitol Police*, 865 F. Supp. 2d 65, 70 (D.D.C. 2012) (rejecting the materiality of "loss[es] of reputation," including those that stem from "[f]alse accusations," where there are no "accompanying negative employment consequences").

*Chao*, 540 U.S. 614, 625 n.9 (2004) (explaining that a similar argument would "get the cart before the horse"). Any award of attorney's fees would be a "post-judgment matter collateral to a decision on the merits." *McGuire v. Russell Miller, Inc.*, 1 F.3d 1306, 1315 (2d Cir. 1993).

No injunction against future retaliation is appropriate either. Injunctions against future unlawful retaliation, like other injunctions, require an "irreparable injury" and evidence showing "imminence of further retaliation." *Wagner v. Taylor*, 836 F.2d 566, 576 (D.C. Cir. 1987). Even assuming that future retaliation against Reid would irreparably harm her, she has neither allegations nor evidence that could satisfy the imminence requirement. Her complaint merely asks the Court to "[e]njoin the [Administration] from future retaliation and discrimination," Compl. at 48, and her brief opposing Defendant's motion notes that further relief is possible by "enjoining Defendant from taking illegal actions," ECF No. 32-1 at 11 n.6. But the Administration, of course, already must refrain from illegal retaliation. The Court cannot issue an obey-the-law injunction; any order must "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(C). Without an imminent retaliatory act with particular form, the Court could not produce "an operative command capable of enforcement." *Int'l Longshoremen's Ass'n v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 74 (1967) (quotation omitted).

Finally, a declaratory judgment would "serve no useful purpose." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995). As both the Supreme Court and the D.C. Circuit have recognized, it is within this Court's discretion to decline to entertain a request for a declaratory judgment. *See Patton Boggs LLP v. Chevron Corp.*, 683 F.3d 397, 401 (D.C. Cir. 2012) (citing *Wilton*, 515 U.S. at 288). In exercising that discretion, courts should strive for "practicality and wise judicial administration." *Wilton*, 515 U.S. at 288. And among the relevant factors is "whether other remedies are available." *Gov't Emps. Ins. Co. v. Rivas*, 573 F. Supp. 2d 12, 14–15 (D.D.C. 2008) (quoting

*Jackson v. Culinary Sch.*, 27 F.3d 573, 580 (D.C. Cir. 1994)).  Here, not only are other remedies available, but they have already become effective.  The Court thus finds that it would be an unwise use of judicial resources to exhume rescinded nullities for a purely declaratory order.

At bottom, insofar as Reid's claim is based on the attempted terminations and the denied pay raise, the Administration has already given her the cognizable element of what she seeks: "full back and front pay, including salary [and other] benefits . . . retroactive to the date of any unlawful action [and] expungement of her official personnel file."  Compl. at 47–48.  So the Court will grant partial summary judgment for Defendant.

### C.   Reid's Remaining Allegations Do Not Identify a Materially Adverse Retaliatory Action by the Administration

That conclusion leaves several other allegedly retaliatory acts at issue.  They are three denials of the use of official time, a letter of caution, a performance evaluation, the imposition of administrative leave, and the suspension of access to Reid's official email.  *See* Compl. ¶ 226. Defendant moves to dismiss Reid's claim insofar as it is based on those allegations, arguing that the alleged acts do not state a claim because they are not materially adverse.  ECF No. 29 at 16–19.  The Court agrees.

A materially adverse action is one that "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *White*, 548 U.S. at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  That standard requires "objectively tangible harm."  *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) (quotation omitted).  Examples include a "reduction in grade, pay, or benefits," an "extraordinary reduction in responsibilities that persisted for years," *id.*, and a transfer that diminishes the employee's responsibilities, *see Pardo-Kronemann v. Donovan*, 601 F.3d 599, 607 (D.C. Cir. 2010).  The antiretaliation provision's role is to prevent "employer interference with unfettered access to Title VII's remedial mechanisms,"

19

so the Court must focus on acts with an objectively realistic probability of doing so, not to enforce a "general civility code." *See Chambers*, 35 F.4th at 876–77 (quotations omitted).

At the pleading stage, a court should accept a plaintiff's allegations as true and decide whether, as a matter of law, the challenged acts were materially adverse. *See, e.g.*, *Hornsby v. Watt*, 217 F. Supp. 3d 58, 64–69 (D.D.C. 2016); *Tyes-Williams*, 361 F. Supp. at 13–14; *Zelaya v. UNICCO Serv. Co.*, 733 F. Supp. 2d 121, 129–131 (D.D.C. 2010). That is, courts ask whether the allegedly retaliatory act would "deter a reasonable employee from filing a discrimination claim." *Zelaya*, 733 F. Supp. 2d at 131. Alleged harms also must not be "unduly speculative" in terms of whether or how the act affected the plaintiff. *See Bridgeforth v. Jewell*, 721 F.3d 661, 663–65 (D.C. Cir. 2013) (quotation omitted).

A threshold question is whether the Court should aggregate the alleged actions or consider them individually. Some courts have suggested "that a series of independent actions taken together, none of which would be considered [material adversity] alone, can constitute [material adversity] in totality." *Taylor v. Mills*, 892 F. Supp. 2d 124, 148 (D.D.C. 2012) (quotation omitted). As this Court explained in *Tyes-Williams*, courts in this district have split about how to decide whether to aggregate. 361 F. Supp. 3d at 13–14 (collecting cases). This Court there endorsed a "case-by-case" approach, and it adopts that approach again here. *Id.* at 13 (quotation omitted).

Individual consideration is more appropriate for these allegations. The incidents of which Reid complains span many months. The denials of the use of official time happened in January 2013, Compl. ¶ 63, January 2014, Compl. ¶ 96, and March 2014, Compl. ¶ 99. Reid received the letter of caution in April 2014, Compl. ¶ 113, the performance evaluation in August 2014, ¶ 127, and was placed on administrative leave a few days later, ¶¶ 136–39. The diffuse timing of most of those incidents does not support the inference that they had a collective deterrent effect.

Still, Reid repeatedly asserts that the whole effect was greater than the sum of the parts. *See* ECF No. 32-1 at 29 (describing a "pattern of antagonism"); *id.* at 30 (describing "palpable, daily fear, worry, and panic"); *id.* at 33 (describing an act as a "link in a chain of events"); *id.* at 35 (describing a "web of retaliatory antipathy").  She explains that, in federal service, termination takes a long time and must be supported by a robust record of misconduct.  *Id.* at 36–39.  In that context, she says, all these facts are "intertwined" with the Damoclean threat of eventual termination, which ultimately materialized here.  *Id.* at 38–39.

But that argument amounts to nothing but an assertion of "subjective fears and perceptions about [her] job security."  *Taylor*, 892 F. Supp. 2d at 149 (holding that such fears do not warrant aggregating independent actions).  Presumably, most employees who experience minor rebukes are concerned that those may lead to more serious consequences.  If anything, such fears are *less* salient in federal service if, as Reid has described it, it is *harder* for an employer to fire an employee.  And a termination or attempted termination can be considered for its own effect—as has already happened here.

At bottom, Reid alleges nothing unique about the Administration's actions that would warrant an "incidents-collectively-viewed" approach.  *See Baloch v. Norton*, 517 F. Supp. 2d 345, 362–63 (D.D.C. 2007) (providing the example, from an Eleventh Circuit case, of a manager who "mis-scheduled the plaintiff's work hours, denied her a lunch break, surveyed co-workers for complaints about her, reprimanded her, suspended her for one day and threatened to shoot her in the head").  Mindful that most cases warrant treating alleged forms of retaliation as "discrete acts," the Court will do so here.  *See Tyes-Williams*, 361 F. Supp. 3d at 13–14 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)).

Start, then, with Gayle's restrictions on Reid's use of official time.  As Reid explains, the use of official time for nonwork activities or for work during off hours is essentially a form of paid leave because it allows employees either to take later time off from work or to avoid working overtime.  *See* ECF No. 32-1 at 15 n.9.  So the problem for Reid's position is that the denial of a few hours' leave is not a material harm.  *See Lurensky v. Wellinghoff*, 167 F. Supp. 3d 1, 18 (D.D.C. 2016); *Ramsey v. Moniz*, 75 F. Supp. 3d 29, 54 (D.D.C. 2014); *Dorns v. Geithner*, 692 F. Supp. 2d 119, 133 (D.D.C. 2010).  To be material, as one court has explained, such a denial must concern "either a significant period of time—[at least] three to four weeks," or some independent "financial harm arising out of the denial."  *Lurensky*, 167 F. Supp. 3d at 17–18 (citing *Childs-Pierce v. Utility Workers Union*, 383 F. Supp. 2d 60, 65 (D.D.C. 2005), and *Diggs v. Potter*, 700 F. Supp. 2d 20, 43 (D.D.C. 2010)).

Reid's allegations of official-time denials concern four hours, Compl. ¶ 64, two hours, Compl. ¶ 97, and seven hours, Compl. ¶ 98, of requested leave, falling far short of that line.  Reid also alleges no independent financial harm, such as the loss of pay, from these denials.  *See Diggs*, 700 F.2d at 43.  And her third allegation does not even represent that the seven hours of official-time use was denied outright; instead she says Gayle told her she could not use official time *on the requested day* because Gayle wished to meet with her about an assignment.  *See* Compl. ¶¶ 98–99.  If the inability to use seven hours of leave is an immaterial harm, it follows *a fortiori* that Gayle's rescheduling of leave was immaterial.

The letter of caution and the "unacceptable" performance review were even less weighty.  Such warnings "typically constitute adverse actions only when attached to financial harms."  *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008).  Negative feedback, so long as it is not "abusive," is not necessarily harm at all because it "can prompt an employee to improve her

performance." *Id.* (quotation omitted).  An employee must therefore show that "her grade or salary was adversely affect[ed] by any of her evaluations."  *Hargrove v. AARP*, 205 F. Supp. 3d 96, 115 (D.D.C. 2016).

Reid did not allege that Gayle or any other manager used abusive language in reprimanding her.  *See* Compl. ¶¶ 108–35.  Instead, she contradicts apparent allegations that *she* acted abusively. *See* Compl. ¶¶ 129–31.  So even if abusive language can conceivably push negative feedback over the materiality line, there is no basis for that inference here.

Reid does, however, allege that the performance review caused one form of tangible financial harm:  She explains that it was the basis for the denied pay increase.  *See* Compl. ¶¶ 183–84. But the Administration nullified that harm, as the Court has already held, by retroactively awarding that raise and paying the difference with interest.  Reid alleges no other independent consequences from that evaluation.  So even if that allegation ordinarily would state a claim, having already concluded that summary judgment is appropriate for the alleged consequence itself, there remains no unremedied harm from the performance review.[6]

Still, as the Court has already explained, "a diminution in pay or benefits can suffice even when the employer later provides back pay," *Greer*, 505 F.3d at 1317, because even a temporary loss of "cash flow can cause serious financial hardship."  *Spector*, 2020 WL 977983, at *11.  Given that the focus of this inquiry is ultimately on the objective likelihood that a reasonable worker would be dissuaded from making a discrimination claim, *see White*, 548 U.S. at 68–69, there are cases in which a later remedy is inadequate to dispel the inference of material adversity.  But this is not such a case.  For one thing, Reid does not here allege a "diminution" in pay, but a failure to

---

[6] Insofar as this conclusion requires fresh consideration of matters outside the pleadings, the Court treats this portion of Defendant's motion as one for summary judgment under Rule 12(d) for the reasons already stated.  *Supra* Section II.B.

increase pay.  *See Greer*, 505 F.3d at 1317; Compl. ¶ 197.  She also alleges nothing about her financial situation that would permit the inference that a stagnant salary caused her "serious financial hardship."  *Spector*, 2020 WL 977983, at *11.  A temporary withholding of additional money does not present the same power to dissuade as does the disruption of a regular salary on which an employee may have based her extant financial commitments.

The Court cannot infer that the reproaches were delivered abusively, that they had unremedied financial consequences, that they caused temporary diminutions in pay or benefits, or that they exerted comparable dissuasive pressure.   Thus, neither the letter of caution nor the "unacceptable" performance review amounts to a materially adverse action.

The story is the same for Reid's placement on administrative leave.  "[P]lacing an employee on paid administrative leave does not, in and of itself, constitute a materially adverse action."  *Hornsby*, 217 F. Supp. 3d at 66; *accord Webster v. Spencer*, No. 17-CV-1472 (DLF), 2020 WL 2104231, at *9 (D.D.C. May 1, 2020).  One court in this district has recognized a distinction between paid leave pending an investigation and paid leave as an explicit "punishment for a concluded investigation."  *Wesley v. Georgetown Univ.*, No. 18-CV-1539 (BAH), 2018 WL 5777396, at *6 (D.D.C. Nov. 2, 2018).  But any such distinction is immaterial here because Reid alleged that her leave was instituted "pending investigation of allegations" of misconduct.  Compl. ¶ 139.  This case is thus of the ordinary variety where paid leave imparts no tangible consequences.

Finally, that Reid could not access her official email account during that leave makes no difference.  Reid's expressed desire to retain email access so that other "[e]mployees seeking to assert their . . . rights [could] easily locate [her]," ECF No. 32-1 at 41, is precisely the sort of "unusual subjective feeling[ ]" that the objective standard for material adversity must discount, *see White*, 548 U.S. at 68–69.  No doubt, the ability to help coworkers assert their rights is important

to many people, including Reid.  But it beggars belief to claim that the prospect of temporarily, during a period of paid administrative leave, having to do so by one's "personal" email account, Compl. ¶ 154, is alone enough to "deter a reasonable employee from complaining about discrimination," *White*, 548 U.S. at 69.  Reid cites no caselaw suggesting that such a harm is material, or even addressing a similar issue, *see* ECF No. 32-1 at 40–43—and that paucity may itself say something about the reasonableness of her assessment of harm.  The few cases that address similar circumstances have declined to hold such a harm is material.[7]  This Court will do the same.

*   *   *

Having already rendered summary judgment for Defendant on the actions that imposed tangible harm on Reid (but were remedied), the Court holds that none of the remaining allegedly retaliatory acts are sufficiently likely to dissuade a reasonable employee from reporting discrimination.  Reid thus has not stated a retaliation claim based on the live allegations.  Because that conclusion relies on the nature of the alleged harms and not insufficient information about them—and because Reid has already amended her complaint twice—the Court finds that deficiency cannot be cured with new factual allegations.  *See Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996).  So Reid's complaint will be dismissed in remaining part with prejudice.

---

[7] *See Parker v. Arizona*, No. 17-CV-887 (DWL), 2019 WL 2136290, at *9 (D. Ariz. May 13, 2019); *Anderson v. Hibu, Inc.*, 26 F. Supp. 3d 1019, 1027 (D. Or. 2014); *Frey v. Berkley Specialty Underwriting Managers, LLC*, No. 10-CV-4114 (CAP), 2013 WL 12291870, at *3 (N.D. Ga. Feb. 13, 2013); *cf. also Hashemian v. Louisville Reg'l Airport Auth.*, No. 3:09-CV-951 (TBR), 2010 WL 3001972, at *6 (W.D. Ky. July 28, 2010) (retaliation under the Family and Medical Leave Act); *Castro v. Chertoff*, No. 06-CV-20512 (TEB), 2007 WL 9702154, at *7–8 (S.D. Fla. July 27, 2007) (revocation of email access where employee was not on leave); *Toland v. Potter*, Nos. 05-CV-2409, 06-CV-2068 (JWL), 2007 WL 1695196, at *7 (D. Kan. June 8, 2007) (removal of computer in antidiscrimination claim); *but see EEOC v. Se. Telecomm., Inc.*, 780 F. Supp. 2d 667, 686–87 & n.5 (M.D. Tenn. 2011) (holding that the revocation of email access could be materially adverse where it was paired with a suspension and the employee was paid in part by commissions).

## IV.    Conclusion

For all the above reasons, the Court will deny Defendant's motion insofar as it seeks dismissal for lack of subject-matter jurisdiction, grant partial summary judgment for Defendant on Reid's claim insofar as it stems from the rescinded firings and denied pay increase, and dismiss in remaining part Reid's complaint for failure to state a claim.  A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: February 23, 2023